1  **PERKINS COIE LLP**
   Matthew L. Goldberg, Bar No. 267295
2  MGoldberg@perkinscoie.com
   Lauren Trambley, Bar No. 340634
3  LTrambley@perkinscoie.com
   505 Howard Street, Suite 1000
4  San Francisco, California 94105-3204
   Telephone: +1.415.344.7000
5  Facsimile: +1.415.344.7050

6  John H. Gray, *pro hac vice forthcoming*
   JHGray@perkinscoie.com
7  2525 E. Camelback Road, Suite 500
   Phoenix, Arizona 85016-4227
8  Telephone: +1.602.351.8000
   Facsimile: +1.602.648.7000

9
   Attorneys for Plaintiff CUT AND DRY, INC.
10

11             **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13

14

15 | CUT AND DRY, INC.,                  | Case No.  26-cv-1226 |
16 |         Plaintiff,                   | **COMPLAINT FOR:** |
17 |         v.                           | **(1) MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836;** |
18 | KARL HEIMAN, an individual,          |
19 |         Defendant.                   | **(2) MISAPPROPRIATION OF TRADE SECRETS UNDER THE CALIFORNIA UNIFORM TRADE SECRETS ACT, CAL. CIV. CODE §§ 3426, ET SEQ.;** |
20
21                                        | **(3) BREACH OF CONTRACT;** |
22                                        | **(4) BREACH OF THE DUTY OF LOYALTY;** |
23
24                                        | **DEMAND FOR JURY TRIAL** |

25
26
27
28

## I.    INTRODUCTION

1. This case arises from a calculated scheme by Defendant Karl Heiman ("Heiman") to steal hundreds of files constituting the trade secrets, confidential business information, and proprietary data of his former employer, Plaintiff Cut and Dry, Inc. ("Cut and Dry"), and to use Cut and Dry's information to benefit his employment with, and the business interests of, his new employer, Pomegranate Technologies, Inc. d/b/a Pepper ("Pepper"), a direct competitor to Cut and Dry.

2. Cut and Dry is an innovative technology company based in Palo Alto, California, that is transforming the foodservice industry with its all-in-one e-commerce and sales enablement platform. Cut and Dry connects distributors, operators, and manufacturers through a powerful digital experience that streamlines online ordering, payments, delivery tracking, and customer communications—all designed to help foodservice businesses grow revenue, save time, and improve customer satisfaction. Additionally, the company has introduced industry-specific AI tools, such as "Yes, Chef!", that help distributors prospect new customers, maximize existing accounts, and uncover hidden revenue opportunities, representing one of the first AI applications built for foodservice commerce. Critical to this growing business is Cut and Dry's ability to sign on and retain customers and partners at various stages of the foodservice industry. To do so, Cut and Dry relies heavily on its trade secrets and other confidential information relating to its products, business strategies, pricing, and customer connections.

3. Heiman was a senior sales executive at Cut and Dry who had access to the company's most sensitive confidential information, including customer contracts, pricing and pricing strategies, sales pipeline data, go-to-market materials and strategies, data relating to individual customers and targets, and product specifications. As a condition of his employment, Heiman signed a Confidential Information and Invention Assignment Agreement ("CIIAA") promising to protect Cut and Dry's confidential, proprietary, and trade secret information during and after his employment, and to return all company property upon termination.

4. Heiman violated those contractual obligations in spectacular fashion. On the morning of January 19, 2026, Heiman was still employed by Cut and Dry, but upon information

-2-

and belief, came to the understanding that his employment was about to end. Less than an hour before he was formally told that he would no longer be employed by Cut and Dry, Heiman intentionally accessed and downloaded information from Cut and Dry's internal Customer Relationship Management ("CRM") database, including confidential information regarding companies, contacts, market qualification data, prospect information, and other related sensitive data that would assist Cut and Dry in its ability to obtain and retain customers. The very next day, Heiman was already meeting with Pepper's leadership team, including Pepper's Chief Executive Officer ("CEO"), Bowie Cheung, on January 20 and 21, and Pepper's Vice President ("VP") of Operations & Strategy and VP of Produce Operations on January 21. Heiman then received an offer to work at Pepper and is currently an employee there.

5.     After he had left Cut and Dry, Heiman intentionally and surreptitiously accessed, shared, and downloaded Cut and Dry's Google Drive and downloaded 503 files containing the company's most sensitive trade secrets—including customer contracts, request for proposals (RFPs), customer sales histories and preferences, customer-specific pricing information, product specifications, demos, and go-to-market strategy documents—and sent them to his personal email address. He similarly repeatedly, intentionally, and surreptitiously accessed his Cut and Dry email account, reviewing numerous confidential emails and attachments relating to Cut and Dry's business. He did not request Cut and Dry's permission to engage in this corporate theft, nor did he inform Cut and Dry that he had done so.

6.     Upon information and belief, Heiman quickly began using Cut and Dry's stolen trade secrets, strategizing on how to steal customers and targets from Cut and Dry and contacting Cut and Dry's existing customers to encourage them to switch to Pepper.

7.     Cut and Dry brings this action to stop Defendant's egregious and ongoing misappropriation of Cut and Dry's confidential, proprietary, and trade secret information, to recover damages for the harm already caused, and to prevent Defendant from further injuring Cut and Dry to Defendant's benefit.

## II.  THE PARTIES

8. Plaintiff Cut and Dry, Inc. is a Delaware corporation with its principal place of business at 228 Hamilton Avenue, 3rd Floor, Palo Alto, California 94301.

9. Defendant Karl Heiman is an individual who, upon information and belief, worked in or around northern California when engaged in employment with Cut and Dry.

## III.  JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Cut and Dry's claims arise under the Defend Trade Secrets Act ("DTSA").

11. Venue is proper in this District under 28 U.S.C. § 1391(b) because Cut and Dry resides in this District, a substantial part of the events giving rise to the claims occurred in this District, including that Heiman performed his employment duties for Cut and Dry in this District, owed duties of loyalty and confidentiality to Cut and Dry in this District, and accessed and downloaded confidential information that Cut and Dry was maintaining for the benefit of Cut and Dry in this District.

## IV.  DIVISIONAL ASSIGNMENT

12. Pursuant to General Order No. 44, because this case arises under intellectual property rights, namely trade secrets, this case is appropriate for a district-wide system of assignment.

## V.  FACTUAL ALLEGATIONS

### A.  Cut and Dry's Business and Trade Secrets

13. Cut and Dry is a technology company that has invested substantial time, capital, and expertise to develop a platform and business that is transforming the foodservice industry. Through years of research, engineering, and close collaboration with distributors, operators, and manufacturers, Cut and Dry has created a highly differentiated system encompassing e-commerce workflows, enterprise resource planning ("ERP") integrations, data architecture, and advanced sales-enablement capabilities. These efforts reflect Cut and Dry's commitment to innovation and its role as a market leader delivering measurable value, operational efficiency, and revenue growth to its customers. Cut and Dry has made substantial investments in product development and

industry-specific expertise to create a highly specialized solution tailored to the unique needs of foodservice distribution. As a result of these efforts, Cut and Dry has established itself as a trusted partner to a growing network of distributors and manufacturers, delivering measurable business value and supporting the industry's broader transition to digital commerce. The company's platform, internal processes, and strategic approach represent the culmination of significant innovation and investment and form a critical foundation of Cut and Dry's business operations and continued growth.

14. Over the course of its operations, Cut and Dry has developed and compiled extensive confidential information and trade secrets that assist Cut and Dry in making sales and developing its business and that would be highly valuable to competitors hoping to develop the same line of business or to customers or other industry players who may use Cut and Dry's information in negotiations with Cut and Dry.

15. Cut and Dry's confidential and trade secret information includes, but is not limited to non-public internally compiled (a) CRM data relating to customers, potential customers, and other industry participants, including non-public data on individual companies and individuals about their preferences, pricing, market qualification data, products, and the nature of the prospect, all of which take considerable time to gather and develop and which are kept confidential at Cut and Dry; (b) sales pipeline and opportunity data and RFPs, including proposals and information gathered to support proposals and marketing strategies; (c) contracts, including confidential terms and conditions to which Cut and Dry is willing to agree and to which certain customers or other industry participants are willing to agree, as well as documents showing revisions to agreements, all of which are critical to Cut and Dry's ongoing contract negotiations and dealings with the same and other companies and individuals; (d) prices offered to specific customers, reflecting Cut and Dry's pricing strategies and pricing methodologies; (e) other financial data, including information relating to costs and financial data that would allow competitors to assess Cut and Dry's revenues, profits, and financial condition; (f) non-public documents relating to Cut and Dry's products; (g) go-to-market strategies and internal business strategy analyses and plans.

16. Cut and Dry's confidential information and trade secrets provide Cut and Dry with economic value because they are not generally known to the public or to Cut and Dry's competitors. Cut and Dry takes reasonable measures to maintain the secrecy of this information, including generally not disclosing the information to individuals outside the company, requiring employees to sign confidentiality agreements, restricting access to sensitive information on a need-to-know basis, decentralizing documents to avoid documents all being housed in a single place where leaks or unnecessary access would be more likely, using password protections and administrator privileges to restrict access to data, restricting the disclosure and use of information using nondisclosure agreements and other confidentiality restrictions, and utilizing physical restrictions to block or prevent access to buildings or locations within buildings where confidential information may be kept.

### B.     Heiman's Employment with Cut and Dry

17. On or about December 14, 2023, Cut and Dry extended an offer of employment to Heiman for the position of Senior Account Executive – Foodservice Distributors. Heiman accepted the offer and began his employment with Cut and Dry on or about January 1, 2024.

18. As a startup company still in its growth phase, Heiman's position was especially important to Cut and Dry's continued growth and customer development.

19. As a condition of his employment, Heiman was required to sign Cut and Dry's CIIAA. On or about December 15, 2023, Heiman executed the CIIAA, agreeing to be bound by its terms.

20. In the CIIAA, Heiman acknowledged that Cut and Dry had "valuable Trade Secrets" to which he would have access during his employment, and agreed not to "solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company."

21. In the CIIAA, Heiman also agreed to "hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform [his] obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other

entity, without written authorization from the Company in each instance, any Confidential Information."

22. The CIIAA defined "Confidential Information" to include "information and physical material not generally known or available outside the Company," including but not limited to "technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company . . . , lists of, or information relating to, suppliers and customers . . ., price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to [him] by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation."

23. The CIIAA further provided that Heiman's confidentiality obligations extended to "any third party that has entrusted information or physical material to the Company in confidence."

24. Heiman also agreed that he would "devote [his] entire best business efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company."

25. Heiman further agreed that, upon termination of his employment, he would be required to "deliver to the Company (and will not keep in [his] possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by [him] pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns."

26. Heiman represented in the CIIAA that his "performance of all the terms of this Agreement does not and will not breach any agreement [he has] entered into, or will enter into,

with any third party" and agreed "not to enter into any written or oral agreement that conflicts with the provisions of this Agreement."

27. The CIIAA further provided that "[v]iolation of this Agreement by [Heiman] may cause the Company irreparable harm," and Heiman agreed "that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, [Heiman] agree[d] that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement."

### C. Heiman's Position and Access to Confidential Information

28. In his role at Cut and Dry, Heiman had access to extensive confidential information and trade secrets belonging to Cut and Dry.

29. Heiman had access to among other things, Cut and Dry's non-public internally compiled (a) CRM data relating to customers, potential customers, and other industry participants, including non-public data on individual companies and individuals about their preferences, pricing, market qualification data, products, and the nature of the prospect; (b) sales pipeline and opportunity data and RFPs, including proposals and information gathered to support proposals and marketing strategies; (c) contracts, including confidential terms and conditions to which Cut and Dry is willing to agree and to which certain customers or other industry participants are willing to agree, as well as documents showing revisions to agreements; (d) prices offered to specific customers, reflecting Cut and Dry's pricing strategies and pricing methodologies; (e) other financial data, including information relating to costs and financial data that would allow others to assess Cut and Dry's revenues, profits, and financial condition; (f) non-public documents relating to Cut and Dry's products; (g) go-to-market strategies and internal business strategy analyses and plans.

### D. Heiman's Meetings and Employment with Pepper

30. Heiman's last day of employment with Cut and Dry was January 20, 2026.

31. Pepper is a direct competitor of Cut and Dry operating in the same foodservice distribution industry.

32. Upon information and belief, on or around January 20, 2026, Heiman met with executives or employees of Pepper.

33. For example, on January 20, 2026, Heiman met with Bowie Cheung, the CEO of Pepper.

34. On January 21, 2026, Heiman met with individuals believed to be Erin Graham, Pepper's VP of Operations & Strategy, and Wes Finch, Pepper's VP of Produce Operations, before meeting again with Bowie Cheung that same afternoon.

35. On or about January 21 or 22, 2026, Heiman received and accepted an offer of employment from Pepper.

E. **Heiman's Theft and Use of Cut and Dry's Trade Secrets**

36. Upon information and belief, both shortly before his employment with Cut and Dry ended and even after his employment ended and his work with a competitor began, Heiman engaged in a campaign to obtain, transfer, and use Cut and Dry's trade secrets and confidential information for his own benefit or the benefit of others, rather than for Cut and Dry's benefit.

37. On January 19, 2026, upon information and belief, Heiman learned that he may soon be terminated from his employment at Cut and Dry.

38. Computer forensic data shows that Heiman accessed Cut and Dry's confidential CRM data in Hubspot on the same day, on or around 10:38 a.m. Pacific Standard Time, slightly before Cut and Dry could announce to Heiman that his employment with Cut and Dry would be ending. He viewed data, including at least a report from Hubspot with information on companies, exported the data to himself, and downloaded the data.

39. Heiman accessed, exported, and downloaded the CRM data intentionally to obtain, transfer, and use Cut and Dry's information without Cut and Dry's consent and to benefit himself and his new employer and to injure Cut and Dry by depriving Cut and Dry of the confidentiality of its information.

40. Computer forensic data also shows that, on or around January 22, 2026, Heiman accessed Cut and Dry's Google Drive. This access occurred from an IP address that, upon information and belief, is associated with Heiman. Heiman accessed approximately 503 files from

Cut and Dry's confidential Google Drive, allowed those files to be shared with his personal email, and then transmitted or downloaded them.

41. Computer forensic data also shows that, around the same time, including on or around January 25 and 26, 2026, Heiman accessed his Cut and Dry Gmail account. In doing so, he viewed numerous emails and attachments and downloaded select email-related documents after leaving his employment with Cut and Dry.

42. Heiman lacked authorization to download and retain files from Cut and Dry's CRM for any purpose other than to benefit Cut and Dry.

43. Heiman lacked authorization to access Cut and Dry's Google Drive and Gmail accounts, as well as to view, share, and download information contained in Google Drive and Gmail.

44. Heiman did not inform Cut and Dry of his attempts to access, share, or download any of the files from January 19 through 26.

45. The files that Heiman accessed, shared, and downloaded from Cut and Dry's systems constitute the company's most valuable and sensitive trade secrets and confidential information. These materials include, among other things: Cut and Dry's non-public internally compiled (a) CRM data relating to customers, potential customers, and other industry participants, including non-public data on individual companies and individuals about their preferences, pricing, market qualification data, products, and the nature of the prospect; (b) sales pipeline and opportunity data and RFPs, including proposals and information gathered to support proposals and marketing strategies; (c) contracts, including confidential terms and conditions to which Cut and Dry is willing to agree and to which certain customers or other industry participants are willing to agree, as well as documents showing revisions to agreements; (d) prices offered to specific customers, reflecting Cut and Dry's pricing strategies and pricing methodologies; (e) other financial data, including information relating to costs and financial data that would allow others to assess Cut and Dry's revenues, profits, and financial condition; (f) non-public documents relating to Cut and Dry's products; (g) go-to-market strategies and internal business strategy analyses and plans.

46. Within days of stealing the confidential files, Heiman began communicating with Cut and Dry's existing customers, suggesting that they move their business to Pepper.

47. Shortly after departing Cut and Dry, upon information and belief, Heiman also participated in meetings with Pepper employees or executives to discuss strategies for taking customers and market share from Cut and Dry.

48. The timing and extent of Heiman's theft—at least hundreds of files from multiple sources in the midst of departing employment at Cut and Dry and joining a competitor, while promptly contacting Cut and Dry's customers and potential customers—demonstrates that Heiman's conduct was intentional and part of a calculated scheme to misappropriate Cut and Dry's trade secrets.

**F.     Cut and Dry's Demands and Defendant's Failure to Cooperate**

49. Upon discovering Heiman's misappropriation, Cut and Dry, through its counsel, contacted Heiman.

50. In the course of correspondence with Heiman, through his counsel, Cut and Dry requested on January 23, 2026 that Heiman provide information about Cut and Dry information in his possession, sequester Cut and Dry information, provide verifiable assurances that he would stop using that information until it could be returned or destroyed, and retain all relevant material, including computer forensic data, such as metadata and other forensic artifacts contained on Heiman's computer(s).

51. Heiman refused to provide any substantive response to Cut and Dry's letter, stating only that he would respond on January 30, 2026—nearly a week later.

52. After receiving Cut and Dry's initial correspondence on January 23, computer forensic data shows that Heiman continued to attempt to access and obtain Cut and Dry confidential information, including at least through accessing internal and sensitive emails and attachments in his Cut and Dry Gmail account.

53. On January 26, 2026, Cut and Dry, through its counsel, sent a follow-up letter to Heiman demanding that he immediately return all Cut and Dry property without altering or using any of the property or metadata contained therein.

54. To date, upon information and belief, Heiman has refused to take a forensic image of any computer to retain forensic data housed on that computer, which could show even more clearly what files and data Heiman was downloading, accessing, using, and sharing.

55. To date, Heiman has also refused to provide an inventory or explanation of the Cut and Dry files in his possession, has failed to take steps to sequester Cut and Dry files, and has failed to provide verifiable assurances that he has not accessed or used any Cut and Dry information since his departure from Cut and Dry. To date, Heiman continues to possess Cut and Dry files, including trade secrets and other confidential information.

## FIRST CAUSE OF ACTION

**Misappropriation of Trade Secrets Under the Defend Trade Secrets Act (18 U.S.C. § 1836)**

56. Cut and Dry incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

57. Cut and Dry owns trade secrets, as defined by 18 U.S.C. § 1839(3), including but not limited to non-public internally compiled (a) CRM data relating to customers, potential customers, and other industry participants, including non-public data on individual companies and individuals about their preferences, pricing, market qualification data, products, and the nature of the prospect; (b) sales pipeline and opportunity data and RFPs, including proposals and information gathered to support proposals and marketing strategies; (c) contracts, including confidential terms and conditions to which Cut and Dry is willing to agree and to which certain customers or other industry participants are willing to agree, as well as documents showing revisions to agreements; (d) prices offered to specific customers, reflecting Cut and Dry's pricing strategies and pricing methodologies; (e) other financial data, including information relating to costs and financial data that would allow others to assess Cut and Dry's revenues, profits, and financial condition; (f) non-public documents relating to Cut and Dry's products; (g) go-to-market strategies and internal business strategy analyses and plans.

58. Cut and Dry has taken reasonable measures to keep its trade secrets confidential, including through physical restrictions, electronic restrictions, and legal and policy restrictions on the access to and transfer of files and other information.

59. Cut and Dry's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

60. Heiman misappropriated Cut and Dry's trade secrets, as that term is defined by 18 U.S.C. § 1839(5), by acquiring Cut and Dry's trade secrets through improper means, including downloading 503 files containing Cut and Dry's trade secrets from the company's Google Drive and transmitting them to his personal email address, and by disclosing and using Cut and Dry's trade secrets without consent.

61. Defendant's misappropriation of Cut and Dry's trade secrets was willful and malicious.

62. As a direct and proximate result of Defendant's misappropriation, Cut and Dry has suffered and will continue to suffer damages in an amount to be proven at trial.

63. In addition to actual misappropriation, Defendant has also threatened misappropriation of Cut and Dry's trade secrets by possessing those trade secrets, refusing to return them to Cut and Dry or to sequester them or otherwise to provide reasonable assurances to Cut and Dry, all with the intent to use those trade secrets in connection with his ongoing work for a Cut and Dry competitor to support his ability to obtain or support customers to the benefit of Cut and Dry's competitor and to the detriment of Cut and Dry.

64. Cut and Dry is entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to prevent Defendant's actual or threatened misappropriation of Cut and Dry's trade secrets.

65. Cut and Dry is entitled to recover damages pursuant to 18 U.S.C. § 1836(b)(3)(B), including both the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not addressed in computing the actual loss.

66. Because Defendant's misappropriation was willful and malicious, Cut and Dry is entitled to exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

67. Cut and Dry is entitled to recover its reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

**SECOND CAUSE OF ACTION**

**Misappropriation of Trade Secrets Under California's Uniform Trade Secrets Act
(Cal. Civ. Code §§ 3426, et seq.)**

68.     Cut and Dry incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

69.     Cut and Dry owns trade secrets, as defined by California Civil Code § 3426.1(d), including but not limited to non-public internally compiled (a) CRM data relating to customers, potential customers, and other industry participants, including non-public data on individual companies and individuals about their preferences, pricing, market qualification data, products, and the nature of the prospect; (b) sales pipeline and opportunity data and RFPs, including proposals and information gathered to support proposals and marketing strategies; (c) contracts, including confidential terms and conditions to which Cut and Dry is willing to agree and to which certain customers or other industry participants are willing to agree, as well as documents showing revisions to agreements; (d) prices offered to specific customers, reflecting Cut and Dry's pricing strategies and pricing methodologies; (e) other financial data, including information relating to costs and financial data that would allow others to assess Cut and Dry's revenues, profits, and financial condition; (f) non-public documents relating to Cut and Dry's products; (g) go-to-market strategies and internal business strategy analyses and plans.

70.     Cut and Dry has taken reasonable efforts to maintain the secrecy of its trade secrets, including requiring employees to sign confidentiality agreements and restricting access to sensitive information on a need-to-know basis.

71.     Cut and Dry's trade secrets derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

72.     Heiman misappropriated Cut and Dry's trade secrets, as that term is defined by California Civil Code § 3426.1(b), by acquiring Cut and Dry's trade secrets through improper means and by disclosing and using Cut and Dry's trade secrets without consent.

73. Defendant's misappropriation of Cut and Dry's trade secrets was willful and malicious.

74. As a direct and proximate result of Defendant's misappropriation, Cut and Dry has suffered and will continue to suffer damages in an amount to be proven at trial.

75. In addition to actual misappropriation, Defendant has also threatened misappropriation of Cut and Dry's trade secrets by possessing those trade secrets, refusing to return them to Cut and Dry or to sequester them or otherwise to provide reasonable assurances to Cut and Dry, all with the intent to use those trade secrets in connection with his ongoing work for a Cut and Dry competitor to support his ability to obtain or support customers to the benefit of Cut and Dry's competitor and to the detriment of Cut and Dry.

76. Cut and Dry is entitled to injunctive relief pursuant to California Civil Code § 3426.2 to prevent Defendant's actual or threatened misappropriation of Cut and Dry's trade secrets.

77. Cut and Dry is entitled to recover damages pursuant to California Civil Code § 3426.3, including both the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not addressed in computing the actual loss.

78. Because Defendant's misappropriation was willful and malicious, Cut and Dry is entitled to exemplary damages pursuant to California Civil Code § 3426.3(c).

79. Cut and Dry is entitled to recover its reasonable attorneys' fees pursuant to California Civil Code § 3426.4.

### THIRD CAUSE OF ACTION

**Breach of Contract**

80. Cut and Dry incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

81. On or about December 15, 2023, Heiman agreed to and signed the CIIAA, a valid and enforceable contract.

82. Under the CIIAA, Heiman had an obligation, among other things: (a) to "hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform [his] obligations to the Company under the Relationship, and not to disclose to any

person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information"; (b) to "not make copies of such Confidential Information except as authorized by the Company"; (c) to "devote [his] entire best business efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company"; (d) upon termination of employment, to "deliver to the Company (and will not keep in [his] possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by [him] pursuant to the Relationship or otherwise belonging to the Company"; and (e) not to "enter into any written or oral agreement that conflicts with the provisions of this Agreement."

83. The foregoing covenants in the CIIAA were intended and necessary to protect Cut and Dry's legitimate business interests in its confidential information and to prevent irreparable harm to Cut and Dry, and this was expressly agreed to in the CIIAA.

84. Cut and Dry performed all of its obligations under the CIIAA, or its performance was excused.

85. Heiman materially breached the CIIAA by, among other things: (a) disclosing Cut and Dry's Confidential Information to Pepper and other third parties without authorization; (b) using Cut and Dry's Confidential Information for purposes other than the benefit of Cut and Dry; (c) making copies of Cut and Dry's Confidential Information by downloading files from Cut and Dry's systems and transmitting them to his personal email address or otherwise to himself or others; (d) engaging in employment with Pepper and activities detrimental to Cut and Dry's interests without Cut and Dry's prior written consent while still employed by Cut and Dry; (e) failing to deliver to Cut and Dry all company property, records, data, and other documents upon termination of his employment; and (f) entering into an employment agreement with Pepper that conflicts with the provisions of the CIIAA.

86. As a direct and proximate result of Heiman's breach of the CIIAA, Cut and Dry has suffered and will continue to suffer damages in an amount to be proven at trial.

87. Cut and Dry is entitled to injunctive relief to enforce the terms of the CIIAA, as Heiman acknowledged in the CIIAA that "violation of this Agreement by [Heiman] may cause the Company irreparable harm" and agreed that "the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions."

## FOURTH CAUSE OF ACTION

### Breach of the Duty of Loyalty

88. Cut and Dry incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

89. As an employee of Cut and Dry, Heiman owed Cut and Dry a duty of loyalty.

90. Heiman's duty of loyalty required him to act in Cut and Dry's best interests, to refrain from self-dealing, and to refrain from taking actions adverse to Cut and Dry's interests while employed by the company.

91. Heiman had this duty at least during the full term of his employment, which extended until January 20, 2026.

92. Heiman breached his duty of loyalty to Cut and Dry by, among other things, (a) acting as an agent or in the interest of Pepper during his employment with Cut and Dry; (b) stealing Cut and Dry's trade secrets and confidential information for the benefit of Pepper; (c) using Cut and Dry's trade secrets and confidential information to solicit Cut and Dry's customers on behalf of Pepper; and (d) participating in meetings with Pepper personnel to discuss Cut and Dry's customers and prospective customers. Cut and Dry did not consent to any of this conduct and, once it became aware, took steps to remedy the situation.

93. Heiman's breach of his duty of loyalty was willful, malicious, and fraudulent.

94. As a direct and proximate result of Heiman's breach of his duty of loyalty, Cut and Dry has suffered and will continue to suffer damages in an amount to be proven at trial.

95. Cut and Dry is entitled to exemplary or punitive damages against Heiman for his willful, malicious, and fraudulent breach of his duty of loyalty.

**PRAYER FOR RELIEF**

WHEREFORE, Cut and Dry respectfully prays for judgment against Defendant, jointly and severally where applicable, as follows:

1. For a preliminary and permanent injunctive relief:

    a. Enjoining Defendant and all persons in active concert or participation with him from using, disclosing, or otherwise misappropriating any of Cut and Dry's confidential, proprietary, and/or trade secret information;

    b. Enjoining Defendant and all persons in active concert or participation with him from soliciting or contacting any of Cut and Dry's customers or prospective customers using Cut and Dry's confidential, proprietary, and/or trade secret information;

    c. Requiring Defendant to immediately return to Cut and Dry all documents, materials, data, and other property belonging to Cut and Dry, including all copies thereof;

    d. Requiring Defendant to identify all individuals who have received or had access to any of Cut and Dry's confidential, proprietary, and/or trade secret information;

    e. Requiring Defendant to preserve all documents, materials, data, computer systems, and other evidence relating to the matters alleged herein;

    f. Such other injunctive relief as the Court deems just and proper;

2. For compensatory damages in an amount to be proven at trial;

3. For exemplary or punitive damages in an amount to be proven at trial;

4. For disgorgement of any profits or unjust enrichment obtained by Defendant as a result of his wrongful conduct;

5. For reasonable attorneys' fees and costs of suit;

6. For pre-judgment and post-judgment interest; and

7. For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Cut and Dry hereby demands a trial by jury on all issues so triable.

Dated:  February 9, 2026  **PERKINS COIE LLP**

By: */s/ Matthew L. Goldberg*
Matthew L. Goldberg, No. 267295
Lauren Trambley, Bar No. 340634
John H. Gray, *pro hac vice forthcoming*

Attorneys for Plaintiff CUT AND DRY, INC.